**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 240683-U

Order filed February 26, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| *In re* MARRIAGE OF RAUL PADILLA, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Petitioner-Appellant, | ) | Will County, Illinois. |
| | ) | |
| | ) | Appeal No. 3-24-0683 |
| and | ) | Circuit No. 21-D-380 |
| | ) | |
| ANNA PADILLA, | ) | The Honorable |
| | ) | Victoria M. Kennison, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON delivered the judgment of the court.
Presiding Justice Hettel and Justice Davenport concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   In a dissolution of marriage case, the trial court properly found that the parties' marital home and two businesses that petitioner had opened during the marriage were marital property and that petitioner had dissipated certain marital assets. The trial court erred, however, in ordering petitioner to pay retroactive temporary maintenance out of his postdivision assets instead of out of marital assets, in implicitly finding additional dissipation beyond what respondent had proven, and in failing to divide respondent's work retirement account between the parties. Affirmed in part, reversed in part, and vacated in part. Cause remanded.

¶ 2    Petitioner, Raul Padilla, filed a petition for dissolution of his marriage to respondent, Anna Padilla. After a bench trial, the trial court entered a judgment dissolving the parties'

marriage and dividing the parties' property. Raul appeals, arguing that the trial court erred in: (1) ordering him to pay retroactive temporary maintenance out of his postdivision assets instead of out of marital assets, (2) finding that the parties' home and two businesses that Raul had opened during the marriage were marital property, (3) determining that Raul had dissipated marital assets, and (4) failing to divide Anna's work retirement account between the parties. We affirm the trial court's judgment in part, reverse the trial court's judgment in part, vacate the trial court's judgment in part, and remand this case for further proceedings.

¶ 3                                    I. BACKGROUND

¶ 4        Raul and Anna were married in April 1999. They had two children, A.P., born in May 2003, and I.P., born in October 2009. In March 2021, Anna obtained an emergency order of protection against Raul and had Raul removed from the parties' marital home in Orland Park, Illinois. Later that month, Raul filed a petition for dissolution of marriage. Among other things, Raul alleged in the dissolution petition that the Orland Park home was part of the marital estate and that the parties had separated in approximately June 2020. Raul certified under penalty of perjury that the statements set forth in his petition were true and correct.

¶ 5        In April 2021, the emergency order of protection was dismissed on Anna's motion. A few days later, Raul filed a motion to sell the Orland Park home. In the motion, Raul again alleged that the home was part of the parties' marital estate. He also alleged that the parties had separated on or about June 2020. Raul's motion to sell was later denied.

¶ 6        In May 2021, Anna filed a petition for temporary child support, maintenance, and for sole use of the marital home, at least on a temporary basis (collectively referred to, at times, as the petition for temporary relief). The petition for temporary relief remained pending and was not ruled upon until much later in the case.

2

¶ 7        Over a year later, in June 2022, Raul or his parents, Sidronio and Carmen Padilla, purchased a home in Homer Glen, Illinois. The home was purchased in the names of Raul's parents for $580,000. After the purchase closed, Raul and the parties' older daughter, A.P., who was now an adult, moved into the home.

¶ 8        A few months later, in October 2022, Anna, with leave of court, filed a third-party complaint against Raul's parents. In the complaint, Anna alleged that the Homer Glen home had been purchased in Raul's parents' names for $580,000; that she had recently discovered that Raul had withdrawn more than $350,000 from the two restaurant businesses that Raul had opened during the marriage; that $405,000 of the purchase price of the Homer Glen home was paid in cash at the closing of the purchase; that after the closing, Raul had moved into the home; that Raul's parents lived in a home in Bridgeview, Illinois, and did not live in the Homer Glen home; and that Raul was trying to use his parents to conceal his marital assets/income from the two businesses and his legal interest in the Homer Glen home. Anna asked the trial court to impose a constructive trust on the Homer Glen home until the matter was resolved and a final judgment was entered on the dissolution petition.

¶ 9        In January 2023, Anna filed a notice of intent to claim dissipation of marital assets. In the notice, Anna alleged that the irretrievable breakdown of the marriage had begun in about January 2017. Anna alleged further in the notice that Raul had dissipated marital assets by: (1) taking draws of approximately $305,000 from the restaurant businesses consisting of approximately $59,000 in 2019, approximately $201,000 in 2020, and approximately $45,000 in 2021; and (2) providing $405,000, which had apparently come from the restaurant businesses, for the cash down payment that was used to purchase the Homer Glen home.

¶ 10    In May 2023, the parties entered into an agreed allocation of parental responsibilities and parenting plan. Later that same month, Anna filed a response to the dissolution petition. Among other things, in her response, Anna admitted Raul's allegation that the Orland Park home was marital property/part of the marital estate. In June 2023, Raul filed a partition petition regarding the parties' Orland Park home.

¶ 11    In July 2023, a hearing was held on Anna's petition for temporary relief. At the conclusion of the hearing, the trial court granted Anna's request and set the amounts to be paid by Raul as $220 per month for temporary child support and $950 per month for temporary maintenance ($1,170 per month in total). The payments were to begin that same month. The trial court reserved ruling, however, on the issue of whether retroactive support was to be paid by Raul for the period from May 2021 (the date the petition for temporary relief was filed) to July 2023 (the date Raul's current payments were supposed to begin).

¶ 12    In August 2023, the trial court entered an order consolidating the dissolution petition, the partition petition, and the third-party complaint. A few months later, in October and November 2023, a bench trial was held on all three matters. The bench trial took several days to complete. Both of the parties (Raul and Anna) and the third-party defendants (Sidronio and Carmen) were present in court for the bench trial and were represented by their respective attorneys.

¶ 13    During the bench trial, testimony was presented from Anna, Raul, Sidronio, and from the parties' two expert witnesses. The parties and the third-party defendants also presented numerous exhibits, including the franchise agreements for the two restaurant businesses and various bank statements for the business entities, the parties' joint accounts, and Raul's parent's accounts. Relevant to the issues raised in this appeal, the evidence presented at the bench trial can be summarized as follows.

¶ 14    Anna testified that she was 48 years old and that she worked as an administrative supervisor at a furniture store. Anna had worked in that capacity or in a similar capacity since at least the start of the marriage. Anna's current gross income was approximately $55,000, and she currently lived in the Orland Park marital home with the parties' younger child, I.P., who was 14 years old.

¶ 15    At the time of the marriage, Anna worked as an office manager for a furniture store and Raul worked as a store manager for a different furniture store. Raul and Anna purchased the Orland Park home in 1998, the year before they got married, and took title as joint tenants. The purchase price was $163,000. Raul's parents paid the $33,000 down payment for the home directly to the lender, Financial Federal Bank, to help Raul and Anna out because Raul and Anna did not have the money for the down payment. Raul and Anna obtained a mortgage loan from Financial Federal for the remainder of the purchase price and later refinanced the mortgage after they were married to reduce the term.

¶ 16    At the time of the purchase, Anna and Raul had three joint bank accounts: a savings and a checking account at State of Countryside Bank (Countryside) and a checking account at Financial Federal. Initially, Anna's paycheck was directly deposited into the Countryside checking account and was used to pay the household expenses. Raul's paycheck was directly deposited into the Financial Federal account and was used to pay the mortgage payment. Anna was the person in the relationship who was physically responsible for making the household payments and was, therefore, aware of the money that was going into and coming out of the parties' joint accounts. The parties lived paycheck to paycheck. They were only able to maintain enough money in the Countryside checking account to pay the household expenses and were not

5

able build up any savings in the savings account. The parties also had to use their credit cards on occasion to pay the household expenses.

¶ 17    In about 2006 or 2007, the furniture store that Raul worked for closed, and Raul lost his job. While Raul was unemployed, his parents paid $100,000 to the bank to pay off the mortgage on the Orland Park home so that Raul and Anna would not have to struggle financially. When Raul's parents did so, they did not indicate that they were expecting to be paid back.

¶ 18    After Raul lost his job, he worked a few small jobs for a brief period. He eventually opened an insurance business through Farmers Insurance. Anna's understanding was that Raul owned the business and that he was an independent contractor or an independent agent of Farmers. Anna did not know how much Raul was being paid for his work at the time or whether Raul had other financial accounts. Raul no longer had his paycheck, if he received one, directly deposited into the parties' joint account. Instead, Raul would deposit cash into one of the joint accounts when the parties needed additional money to pay the monthly household expenses. Raul operated the insurance business for five or six years.

¶ 19    In about 2010 or the beginning of 2011, Raul sold the insurance business so that he could open up a Jersey Mike's restaurant. Anna did not know the terms of the sale of the insurance business, was not involved in the sale, had not seen any of the sale documents, and did not know how much money Raul had received for the business. Raul did not discuss with Anna how he was going to have money to open a restaurant, but she thought, based upon the timing of the sale of the insurance business compared to when the restaurant opened, that Raul must have gotten the money from the sale of the insurance business.

¶ 20    During that same time period, in approximately 2011, Raul formed an Indiana limited liability company named Sandwich King, LLC, so that he could purchase a Jersey Mike's

6

franchise and open a Jersey Mike's restaurant. The restaurant was located in Schererville, Indiana, and opened in about 2011. At some point later, Raul formed a second business entity named Team Munster, LLC (actually Team Munster, Inc.), so that he could purchase a second Jersey Mike's franchise and open a second Jersey Mike's restaurant in Indiana. The second restaurant opened in 2019 or 2020 during the pandemic and was located in Munster, Indiana. Anna was not involved in, and had little to no knowledge of, the formation of the business entities, the acquisition of the franchises, the leasing of the properties, or the running of the businesses. She did not know how much Raul had paid for the franchises, the leases, the buildout of the properties, the fixtures, or the food, and had no knowledge as to the source of the money. Anna was well aware, however, of the money that went into and out of the parties' joint accounts and was able to confirm on the witness stand that none of the money from those accounts was used to pay for the businesses. In addition, although the parties had taken out a $100,000 line of credit on the Orland Park home in case they needed the money while Raul was opening the first restaurant, the line of credit was never accessed. Nor was money from Anna's retirement account at work ever used for anything having to do with the two businesses. Anna testified that she was required to sign the lease and was also a co-guarantor of the lease and of the franchise agreement for the first franchise but acknowledged that the lease for the first restaurant property that she was shown on the witness stand did not corroborate her testimony.

¶ 21　　　　The two business entities that Raul had formed had their own business accounts. Anna's name was not on those accounts, and she did not have access to those accounts. Prior to conducting discovery in this case, Anna had never seen bank statements for either of the two business entities or paystubs for Raul's work for those entities. Anna acknowledged in her testimony, however, that letters pertaining to the two entities were sent to the Orland Park home,

7

but she did not open those letters because they were addressed to Raul. Anna also learned during the discovery process about the draws that Raul had taken from the business entities.

¶ 22    During her testimony, Anna was shown several years of her and Raul's joint federal tax returns. Anna stated on the witness stand that she was not involved in the preparation of those returns and had never looked at those returns. Anna acknowledged, however, that she had signed the returns and also acknowledged the amount of adjusted gross income that was listed on each of the returns. The returns showed that the parties' adjusted gross income was approximately $13,000 in 2012; approximately $38,000 in 2013; approximately $45,000 in 2014; approximately $75,000 in 2015; approximately $92,000 in 2016; approximately $125,000 in 2017; approximately $134,000 in 2018; and approximately $140,000 in 2019. During those years, the only income that Anna had received was from the furniture store, and the only income that Raul had received was from the Schererville restaurant. Anna continued to have her check directly deposited into the Countryside joint checking account and continued to pay the household expenses from that account. Raul no longer had direct deposit but continued to occasionally deposit cash into one of the Countryside joint accounts if there was not enough money in the joint checking account to pay the bills. Anna had no idea where the rest of the money from Raul's paycheck (if he received one) went, although Raul did tell her that all of the money that he received was being put back into the business. Anna also did not know whether Raul had any other financial accounts during that time period. When Anna would ask Raul about the money from the business, it would turn into an argument, and Raul would stop talking to her for months at a time.

¶ 23    According to the financial records, in November 2020, Raul's parents had each opened a joint bank account at Citibank with Raul. The opening balance in Raul's account with his father

8

was approximately $69,000. Raul did not list either of those accounts on his financial affidavit. In addition, in October 2020, the landlords for the restaurants wrote Raul's father two checks that totaled $60,000. Prior to filing her third-party complaint, Anna was not aware of those checks. Anna knew, however, that Raul's parents had sold some property in Mexico.

¶ 24   In November 2021, Anna began working for a different furniture store. At some point thereafter, she switched her direct deposit to a checking account she had opened in her name alone at PNC Bank and began paying the household expenses out of that account. Raul knew about the PNC Bank account but did not have access to it.

¶ 25   According to Anna, the parties had experienced marital problems for the past several years. Anna estimated that the marriage had begun to break down in about January 2017. During that time period, the parties would argue a lot about money, and Raul would stop talking to Anna for long periods. The arguing and lack of communication continued throughout the year. In December 2017, Anna had sinus surgery. Prior to the surgery, the parties had not spoken for months. While Anna was recovering at home, Raul told her that the surgery had saved him from filing for divorce. From 2018 going forward, Anna and Raul argued constantly about money and the kids. Raul continuously accused Anna of having a drinking problem and of cheating on him. By about June 2020, things had gotten really bad at home. Raul would follow Anna around the house just looking to start an argument. Anna did not want the parties' children to see her and Raul arguing so she physically separated from Raul. During the separation, the parties both continued to live in the Orland Park home, but Anna lived downstairs, and Raul lived upstairs. In March 2021, Anna obtained an emergency order of protection against Raul, and he was removed from the home. The order of protection was later dismissed, but Raul never went back to residing in the home.

¶ 26 At various times during the marriage, Anna took substantial loans or withdrawals from her retirement account at work to pay off the parties' credit card debt. According to Anna, over the course of the marriage, she took three loans or withdrawals of $24,000; $20,000 to $23,000; and $100,000. According to a financial statement that was admitted at the trial as an exhibit, Anna had approximately $36,000 in her work retirement account when the dissolution petition was filed. During her testimony, however, Anna estimated that she still had approximately $30,000 in her work retirement account.

¶ 27 In about June 2023, Anna learned that Raul or his parents had purchased a home in Homer Glen. At the time of trial, Raul was living in that home with the parties' older daughter. Anna did not know whether Raul's parents lived in the home. Anna had picked up the parties' younger daughter approximately once a week from the home and had never seen Raul's parents or their vehicle at the home.

¶ 28 Raul testified that he was 53 years old and was living in the Homer Glen home with his parents and with the parties' older daughter. The parties' younger daughter also stayed at the home when Raul was exercising his parenting time. At the time of the marriage, Raul was employed as a store manager at a furniture store. He was paid approximately $57,000 to $58,000 per year in salary and bonuses. Raul and Anna had three joint accounts: a checking and savings account at Countryside and a checking account at Financial Federal. Raul's paycheck was directly deposited into the Financial Federal account to cover the mortgage payment, and the rest would go into one of the Countryside accounts.

¶ 29 In approximately June or July 2007, the furniture store that Raul worked at closed and Raul lost his job. Raul's parents paid off the parties' mortgage on the Orland Park home. After working some small jobs in the winter of 2008, Raul opened a Farmers Insurance agency. Raul

10

worked as an independent contractor for Farmers and was paid a commission and bonuses but had to pay the expenses of the business. During that time period, Raul had an account at Farmers Credit Union and would receive his paycheck directly into that account. Raul would also pay the business expenses and some of the parties' household expenses out of that account. In addition, Raul would give Anna cash, if needed, to pay some of the other household expenses or would use his debit card from the Farmers Credit Union account for those expenses. Raul operated the insurance agency for just under five years until about December 2012 and then closed the business because he was not making enough money. However, he would still receive money from Farmers from time to time for commissions and various things related to the business. The last time that Raul received any money from Farmers was in 2013.

¶ 30        In January or February 2011, Raul opened an individual Chase checking account in his name alone with an initial deposit of $20,000. The money came from Raul's cousin, Miguel Jimenez, with whom Raul planned to open a business. Raul put the account in his name alone, however, because Miguel did not have the good credit necessary to obtain financing for the business. Raul eventually applied and got approved for a Jersey Mike's franchise. As part of the franchise process, Raul had to pay $50,000 to Jersey Mike's when he sent in the franchise agreement. Raul brought his father in as an additional partner, and he (or Raul's mother) gave Raul the $50,000 for the initial payment in the form of a check that was deposited into Raul's Chase account. In September 2011, Raul formed an Indiana limited liability company named Sandwich King, LLC, to be the owner of the business. Raul was the sole member of the company.

¶ 31        At some point in 2012, Raul transferred the Chase account into the business entity's name and made himself the only authorized user of that account. Raul opened his first Jersey

11

Mike's restaurant later that year. The lease for the restaurant was in Raul's name alone; Anna was not on the lease. The cost of the buildout and for the initial materials that were going to be sold in the business was approximately $270,000 to $280,000. Approximately $240,000 of that amount was given to Raul by his father in the form of a check that was deposited into the Chase account. Raul's father had gotten the money by selling some property in Mexico and had the money wired to the business entity's bank account. Another $20,000 of that amount was given to Raul by Miguel (for a total of $40,000 that Miguel had contributed) in the form of a check that was written to Raul and that was deposited into the business entity's bank account. Anna was not involved in the business and none of the money to open or run the restaurant came from the parties' joint accounts. The money that the restaurant generated was used to run the business.

¶ 32        In September 2019, Raul formed an Indiana S corporation named Team Munster, Inc., so that he could use that corporation to obtain a second Jersey's Mike's franchise and open a second Jersey Mike's restaurant. Raul was the sole shareholder of the corporation. The restaurant was to be located in Munster, Indiana. The following month (October 2019), Raul entered into a franchise agreement for the second franchise. To enter into that agreement, Raul had to pay Jersey Mike's a little under $18,000. The money came from the other business entity's account. Raul also received a $50,000 loan from his father to use if he did not have enough money to open the second restaurant. There was no written agreement for the loan; it was just an oral agreement. The money was given to the second business entity by a check dated March 2020 from Raul's parent's checking account. Raul ended up not needing the money and paid it back to his parents in August 2020 by issuing a check from the business entity's account. Raul leased space for the second restaurant. Anna was not on the lease.

12

¶ 33        The cost of the buildout for the second restaurant was approximately $175,000 and was paid for by the first business entity, either directly or by a transfer into the second business entity's Chase account. The landlord for the Munster restaurant agreed to pay a portion of the buildout cost. In October 2020, at Raul's direction, the landlord wrote a check to Raul's father for $34,500 for that purpose.

¶ 34        Raul's second Jersey Mike's restaurant opened in Munster in June 2020. According to Raul, as to both restaurant businesses, he and his father each owned 42% and Raul's cousin, Miguel, owned 16%. There was no written agreement to that effect; it was a verbal agreement between Raul and his father (and, presumably, Raul's cousin).

¶ 35        At some point in 2020, Raul was required by Jersey Mike's to remodel the Schererville restaurant. The remodel cost just under $60,000. Initially, the remodel was supposed to be paid for by Raul or the business, so Raul negotiated with the landlord by bluffing that he was going to move the business to a different location. The landlord agreed to pay a portion of the remodeling cost to keep Raul's business from leaving. Jersey Mike's eventually paid for the remodel, so Raul had the Schererville landlord send a check for the portion of the remodeling cost that the landlord had agreed to pay ($25,000) directly to Raul's father because Raul's father had loaned about $75,000 to the business in 2015 or 2016. According to Raul, there was no paperwork or documentation for that loan. Later during his testimony, however, Raul stated that his father gave him the loan so that he and Anna could pay their household expenses because Raul did not have much money coming in at the time.

¶ 36        After the first restaurant opened, Raul paid himself a salary by taking a draw of $1,200 from the business entity every two weeks. Those draws and any other draws that Raul took were reflected on the parties' tax returns. After the second restaurant opened, Raul paid himself an

13

additional salary by taking a draw of $1,500 from that business entity every two weeks. Those draws and any other draws that Raul took from that entity were reflected in the tax returns as well. Raul would pay himself/take his draws by writing himself a check from the applicable business entity's account and then would usually cash those checks at Chase. Raul would deposit the cash into his and Anna's joint accounts for the payment of household expenses or would give the cash to Anna if it was not convenient for him to go to Countryside Bank to deposit the cash.

¶ 37    Raul estimated that the breakdown of the marriage started in the beginning of March 2021, when he was served with the emergency order of protection. Prior to that time, Raul and Anna had continued to reside together in the Orland Park home. They would sleep in the same bedroom on occasion and would still have sexual relations on occasion. Before receiving the order of protection, Raul had not contemplated getting a divorce and thought that he and Anna were still trying to work things out.

¶ 38    When Raul was shown the franchise agreement for the Schererville restaurant, he acknowledged that the agreement provided that the initial amount that was due to be submitted with the agreement was $7,500, and not $50,000 as Raul had testified. According to Raul, the $50,000 payment requirement was listed in a separate three-store agreement that Raul had also signed that had not been presented at the trial or admitted into evidence. Raul also acknowledged that he and Anna were listed in the first franchise agreement as the principals of the franchise.

When Raul was shown the franchise agreement for the Munster restaurant, he acknowledged that the initial payment required in that agreement was $8,500, and not $18,000, as Raul had stated earlier in his testimony.

¶ 39    According to Raul, neither Jersey Mike's nor the accountant for the two businesses was aware of Raul's partnership with his father and his cousin. Each year when Raul filed the tax

14

returns, he listed himself as the sole member/shareholder of the two business entities. Raul was also listed as the sole authorized user on the bank accounts for the two business entities. Miguel was not listed on either account, and Raul did not have any proof with him at trial of the two payments that Miguel had allegedly made into the businesses. Raul also did not have receipts or anything to substantiate the over $200,000 that was spent on the buildout of the Schererville restaurant and waivered in his testimony, at times, as to whether those receipts existed. Raul maintained that he had received the money from his father but acknowledged that there was no written agreement or documentation showing that his father had given him the money. Raul stated further that the $100,000 line of credit that was established on the Orland Park home was set up in case Raul and Anna needed money while Raul was opening the first restaurant because they did not have much money coming in during that time period. Furthermore, Raul testified that he was not contemplating getting a divorce when he directed his landlords to make payments to his father. Raul confirmed during his testimony that he had taken various draws from the businesses over the past several years, including the draws alleged in Anna's dissipation notice.

¶ 40    According to Raul, his parents opened the two accounts at Citibank as part of a promotion that gave his parents some additional money if they opened the accounts. Only one of his parents' names (and Raul's name) was put on each account because of the way the promotion was structured so that his parents could receive the additional money as to each account instead of as to just one account. The money belonged to Raul's parents and not to him. When Raul's parents closed the accounts, they did not give Raul any of the money.

¶ 41    Sidronio Padilla testified that he was Raul's father and was 80 years old. In June 2022, Sidronio and his wife, Carmen, Raul's mother, purchased the Homer Glen home for $580,000 and moved into the home immediately after the closing. In order to pay for the home, Sidronio

15

and Carmen obtained a mortgage loan of $175,000. The balance that was due on the purchase price was paid at the closing in cash. In the loan application, Sidronio indicated that he had over $400,000 in one of his (or his and Carmen's) bank accounts. Some of that money came from the two prior Citibank accounts that were in his and Raul's names and Carmen's and Raul's names. Raul's name was on Sidronio's Citibank account in case something happened to Sidronio.

¶ 42 Prior to the purchase of the Homer Glen home, Sidronio and Carmen lived in Bridgeview, Illinois, for the past 35 years. The mortgage on the Bridgeview home had been paid off. Sidronio had retired in about 2013. He received a pension and had a retirement account that he had to take a required minimum distribution from each year. He and Carmen also received social security.

¶ 43 Sidronio was paying the mortgage and the property taxes on the Homer Glen home and was also paying for the home insurance, for the upkeep of the home, and for all of the household utilities. Raul did not pay rent to live in the Homer Glen home but did help with money on occasion. Sidronio was also still paying all of the bills relating to the Bridgeview home, which he and Carmen were in the process of selling.

¶ 44 After the lay witness testimony had concluded, the parties presented the testimony of their proposed expert witnesses to try to establish the value of the two restaurant businesses. Prior to the testimony, the experts' written reports had already been admitted into evidence by the stipulation of the parties. Raul's expert, James Spencer, who was not formally tendered as an expert witness or qualified as such by the trial court, testified about his credentials and experience, the information and method that he had used to form his opinion on valuation, and the reasons why he believed that his methodology and valuation opinion were correct. Anna's expert, Erin Hollis, provided testimony of a similar nature but also testified why she believed

that Spencer's valuation opinion was flawed and incorrect. In short, Hollis determined that the value of the two businesses was substantially greater than the value determined by Spencer and also determined that the draws that Raul had taken had nothing to do with the loans that the first business entity had made to the second business entity.

¶ 45    In May 2024, the trial court announced its ruling. The trial court found that the Orland Park home was part of the marital estate. In so doing, the trial court commented that the parties had paid the mortgage and the upkeep on the home out of the marital funds, had resided in the home with the children during the entire course of the marriage, and had refinanced the home with a clear intention to make that nonmarital property marital property. The trial court also noted that the home was purchased in anticipation of the marriage but stated that factor by itself was not enough for the court to find the property marital. The trial court indicated that a very important factor in its determination was that Raul, in his own verified pleadings, made a judicial admission that the Orland Park home was marital property.

¶ 46    As for the two restaurant businesses, the trial court found that they were both marital property.  In reaching that conclusion, the trial court noted that Anna was listed on the franchise agreements as a principal and co-guarantor of the businesses, that Raul had told Anna that he was going to use the money from the sale of the insurance agency to open the first restaurant, and that the parties had taken out a line of credit on the Orland Park home in case they needed the money for the first restaurant. The trial court pointed out that although Raul had claimed that he owned the businesses with his father and his cousin, no documentary evidence was presented to support that claim or to support his assertion that he had received money from his father and his cousin for that purpose. Raul was the sole owner listed on the paperwork for the franchises and declared all of the income from the businesses on his own (or his and Anna's) tax returns. In

17

addition, Raul's father did not provide testimony to support Raul's claim regarding ownership, and Raul's cousin did not testify. Furthermore, even though the second restaurant did not open until after the marriage had potentially started to break down, the funds to acquire the franchise and to open that restaurant came from the first restaurant, were marital funds, and caused the second restaurant to be marital property as well.

¶ 47 With regard to Anna's claim for dissipation, the trial court initially found that the marriage had started breaking down in January 2018. In describing its analysis, the trial court noted that conflicting evidence had been presented on the matter, with Anna testifying that the breakdown had started in January 2017 and Raul testifying that the breakdown had started in March 2021. The trial court discussed the testimony that had been presented regarding the history of the parties' marital problems over the years. The court commented, that by September 2019, Raul had changed the address on the bank statements for the business entities so that the statements would no longer go to the marital home. Further, that by June 2020, things had gotten so bad in the home between the parties that Anna had to physically separate herself from Raul. The trial court found that Anna's testimony about those matters was credible but then indicated that the breakdown of the marriage had begun in January 2019.

¶ 48 Still on the issue of dissipation, the trial court found further that Raul had dissipated marital assets by taking multiple draws from the businesses that totaled approximately $305,000. The draws were taken in 2019, 2020, and 2021, and Raul had failed to establish by clear and convincing evidence that the money was used for marital purposes. To the extent that the testimony of the expert witnesses pertained to the issue of dissipation, the trial court found the testimony and reports of Anna's expert witness to be credible and the testimony and report of Raul's witness not to be credible. The trial court went on to find that Anna had failed to prove

18

her other claim of dissipation with regard to the $405,000 that was allegedly used to purchase the Homer Glen home to the extent that the sum exceeded the draws that Raul had taken from the businesses and that Anna had also failed to prove her third-party claims against Raul's parents.

¶ 49　　　The trial court ultimately divided the marital property between the parties with Anna receiving 53% and Raul receiving 47%. The trial court indicated, however, that it was awarding Anna an extra $50,000 for money that Raul had given to his parents (approximately $110,000), even though Anna had not made an actual dissipation claim for that money. The trial court also awarded Anna retroactive temporary child support and maintenance in the same monthly amounts that had been previously established for the period from when the petition for temporary relief was filed (May 2021) to when it was eventually granted (July 2023). The amount due (approximately $30,000) was to be paid by Raul out of his postdivision assets. The trial court made no division between the parties as to Anna's work retirement account and commented that there was no money left in the account. In addition, based upon its findings and rulings, the trial court denied Raul's partition petition and Anna's third-party complaint. A written decision was issued a few months later in July 2024.

¶ 50　　　After the written decision was issued, Raul filed a motion to reconsider, which the trial court denied. Raul appealed.

¶ 51　　　　　　　　　　　　　II. ANALYSIS

¶ 52　　　On appeal, Raul argues that the trial court erred in: (1) ordering him to pay retroactive temporary child support and maintenance out of his postdivision assets instead of out of marital assets, (2) finding that the parties' home and the two businesses that Raul had opened during the marriage were marital property, (3) determining that Raul had dissipated marital assets, and (4)

19

failing to divide Anna's work retirement account between the parties. We will address each of those arguments in turn.

¶ 53    A. Payment of Retroactive Temporary Child Support and Maintenance

¶ 54    As his first point of contention, Raul argues that the trial court erred in ordering him to pay retroactive temporary child support and maintenance out his postdivision assets instead of out of marital assets. Raul asserts that the trial court's ruling violated the rule set forth in *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 660 (2008), and was contrary to common sense because if such an award had been paid during the course of the dissolution proceeding, rather than retroactively, it would have been paid out of the parties' marital assets or income. Raul asks this court, therefore, to reverse or vacate that portion of the trial court's ruling and to require that a portion of that amount be returned to Raul as his marital share of the amount that was awarded.

¶ 55    Anna responds that the trial court correctly required Raul to pay retroactive temporary child support and maintenance out of his postdivision assets because Anna had paid the expenses of the household and children during that time period using her own income and credit cards and was required to pay that debt after the dissolution from her postdivision assets as well.[1] Anna asks, therefore, that we affirm the trial court's ruling on this issue.

¶ 56    The Illinois Marriage and Dissolution of Marriage Act (Act) provides for awards of temporary child support and maintenance. 750 ILCS 5/501(a)(1) (West 2020). One of the main

___

[1]For this and other issues raised in this appeal, Anna asserts that Raul forfeited his argument by failing to object in the trial court and by failing to raise the issue in his posttrial motion (the motion to reconsider). As Raul correctly points out, however, because the issues did not actually arise until the trial court made its ruling, there was no opportunity for him to object, other than to take an opposite or different position prior to the ruling, which he generally did. In addition, as Raul also notes, because the ruling was the result of a bench trial, he was not required to raise the issues in his posttrial motion to preserve those issues for appellate review. See Ill. S. Ct. R. 366(b)(3)(ii) (eff. Feb. 1, 1994); *Arient v. Shaik*, 2015 IL App (1st) 133969, ¶¶ 26-33. We, therefore, reject Anna's assertions of forfeiture throughout this case.

20

purposes of such an award is to balance the equities between the parties as fairly as possible while the dissolution case is pending. *In re Marriage of Hochstatter*, 2020 IL App (3d) 190132, ¶ 16. A trial court's ruling on a motion or petition for temporary support and maintenance will not be reversed on appeal absent an abuse of discretion. *In re Marriage of Burdess*, 2020 IL App (3d) 190342, ¶ 31; *In re Marriage of Sharp*, 369 Ill. App. 3d 271, 277 (2006). The threshold for finding an abuse of discretion is a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court. See *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009); *In re Leona W.*, 228 Ill. 2d 439, 460 (2008).

¶ 57    In the present case, after reviewing the record and the case law on this issue, we agree with Raul that the retroactive temporary child support and maintenance should have been paid out of the parties' marital assets, rather than out of Raul's postdivision assets. See *Heroy*, 385 Ill. App. 3d at 660 (requiring that a retroactive maintenance award be paid from the parties' marital estate). As Raul correctly notes, the award would have been paid out of the marital assets or income if the award had been made while the dissolution case was proceeding rather than having been made retroactively, the same as the award that was granted in July 2023 and that ran until the dissolution judgment was entered. We, therefore, reverse the trial court's ruling on this issue, vacate the portion of the trial court's order that required Raul to pay the retroactive award out of his postdivision assets, and remand this issue for the trial court to modify its ruling to require that the retroactive award be paid from the marital estate.

¶ 58                    B. Classification of the Home and the Businesses

¶ 59    As his second point of contention, Raul argues that the trial court erred in finding that the Orland Park home and the two restaurant businesses were marital property. First, as to the

21

Orland Park home, Raul asserts that the trial court should have classified the home as nonmarital property and sold the home pursuant to Raul's partition petition because the home was acquired by the parties prior to the marriage. According to Raul, the trial court reached the wrong conclusion on the home because it improperly: (1) gave weight to the fact that the home was purchased in contemplation of the marriage; (2) failed to recognize that the payments on the home that were made by Raul's parents were presumed to be gifts to Raul; and (3) treated Raul's statements in his pleadings and other filings that the property was marital property as judicial admissions or, in the alternative, failed to recognize that any such admissions made by Raul had been waived since testimony was elicited on the issue. Second, with regard to the two restaurant businesses, Raul asserts that the trial court should have classified the businesses as nonmarital property as well, because none of the money from the parties' joint accounts was used to acquire or operate the businesses and because Raul owned the businesses with both his father and his cousin, who had contributed the funds to start up the businesses. For all these reasons, Raul asks that we reverse the trial court's ruling on this issue and that we remand this issue for further proceedings as necessary, including selling the Orland Park home pursuant to Raul's partition petition.

¶ 60    Anna argues that the trial court properly found that the Orland Park home and the two restaurant businesses were marital property and that its findings in that regard should be upheld. As to the Orland Park home, Anna asserts that the statements in Raul's petition and motion were binding judicial admissions and that the trial court appropriately relied upon those admissions in determining that the home was marital property. With regard to the restaurant businesses, Anna asserts that the evidence presented at the bench trial showed that the restaurants were acquired and opened during the marriage and were therefore marital property, and that Raul's testimony to

22

the contrary was contradicted by the other evidence presented. Thus, Anna contends that the trial court's finding that the home and the two businesses were marital property was not against the manifest weight of the evidence. Accordingly, Anna asks that we affirm the trial court's ruling on this issue.

¶ 61 Before property can be assigned or divided in a dissolution of marriage proceeding, it must first be classified by the trial court as either marital or nonmarital. *In re Marriage of Gattone*, 317 Ill. App. 3d 346, 351 (2000). A presumption of marital property applies to all property acquired during the marriage, which may be rebutted by clear and convincing evidence to the contrary. See 750 ILCS 5/503(a), (b)(1) (West 2020); *Gattone*, 317 Ill. App. 3d at 351-52. Any doubts as to the classification of property will be resolved in favor of finding that the property is marital property. *Id.* at 352. One of the listed categories of exceptions to the marital property presumption is property acquired by gift, legacy or descent. 750 ILCS 5/503(a)(1), (b)(1) (West 2020). Thus, property acquired during the marriage by one of the spouses by gift is generally considered to be the nonmarital property of the spouse that received the gift. See *id.*

¶ 62 The question of whether property is marital or nonmarital property is a question of fact that rests upon the trial court's determination as to the credibility of the witnesses and the weight to be given to their testimony as well as the other evidence presented. See *In re Marriage of Lonvick*, 2013 IL App (2d) 120865, ¶ 48. The trial court's finding of whether property is marital or nonmarital will not be reversed on appeal unless it is against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the finding itself is arbitrary, unreasonable, or not based upon the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

23

¶ 63                                    1. The Orland Park Home

¶ 64          In the present case, after reviewing the evidence presented, we conclude that the trial

court properly found that the Orland Park home was marital property. The evidence presented at

the bench trial established that although the parties had purchased the home prior to the marriage,

they held title jointly, and had purchased the home in contemplation of the marriage. Further,

they lived in the home together and with the children during the course of the marriage, paid the

mortgage payments and the upkeep of the home during the marriage using marital funds, and had

refinanced the home with, what the trial court found was the clear intention to turn that

nonmarital property into marital property. Although Raul points to the trial court's recognition

that the home was purchased in contemplation of the marriage as an error in the trial court's

ruling, the trial court specifically acknowledged that it could not base its determination on that

fact alone (see 750 ILCS 5/503(a) (West 2020)) and that it was, instead, basing its determination

on the totality of the evidence presented, including the facts set forth above. We, therefore, find

no error in the trial court's determination that the Orland Park home was marital property.

Having so concluded, we need not determine whether the statements made by Raul in the

dissolution petition and the motion to sell property were judicial admissions.

¶ 65                                2. The Two Restaurant Businesses

¶ 66          As to the two restaurant businesses, after reviewing all of the evidence presented, we

again conclude that the trial court properly classified the property as marital property. The

evidence presented at the bench trial established that the two business entities were formed

during the marriage, that the franchises for the restaurants were acquired during the marriage,

that the leases were entered into during the marriage, that the buildout and remodeling of the

spaces occurred during the marriage, that the food materials were purchased during the marriage,

24

and that the finished food products were sold during the marriage. The funds to open the first restaurant came, at least in part, from the sale of Raul's insurance business, and were marital funds because the insurance business had been opened, operated, and sold entirely during the marriage, and the funds to open the second restaurant came from the first restaurant and were also marital funds.

¶ 67 Although Anna and Raul both testified that no money from the parties' joint bank accounts was used to acquire, open, or operate the businesses, it was also well established that Raul had not been depositing his paycheck into the parties' joint bank accounts since about 2007 or 2008 and was merely giving Anna cash, when necessary, to pay some of the household expenses. In addition, the evidence also showed that Anna was listed on the franchise agreement for at least the first restaurant as a principal of the franchise and as a co-guarantor and that the parties had at one point opened a line of credit on the marital home that was to be used for the first restaurant but was not actually needed. Furthermore, although Raul claimed that he owned the businesses with his father and his cousin, the trial court implicitly found Raul's testimony in that regard not to be credible, as Raul had presented no documentary evidence to establish those ownership interests, was listed as the only owner on both franchise agreements, was the only person who had access to the business entities' bank accounts, was the only person who declared the income from the businesses on his tax returns, and was the only person who took draws from the businesses. Based upon all of the evidence presented and the trial court's implicit assessment of credibility, we find no error in the trial court's determination that the two restaurant businesses were marital property.

25

¶ 68                           C. Dissipation of Marital Assets

¶ 69         As his third point of contention, Raul argues that the trial court erred in determining that he had dissipated marital assets in this case. In support of that argument, Raul asserts first, that the trial court's finding—that he had dissipated approximately $305,000 by taking draws from the businesses—was erroneous because the evidence showed that the breakdown of the marriage did not begin until March 2021, when the dissolution petition was filed. Raul contends there was simply not enough money available for him to take actual draws in such large amounts. In addition, Raul maintains, the trial court was not required to charge that dissipation against Raul's marital share, even if the dissipation had occurred. Second, Raul asserts that the trial court's award of an extra $50,000 to Anna for money that Raul had allegedly given to his parents was a "backdoor" dissipation award that should not have been made because Anna never raised that amount in her notice of dissipation and because the trial court found that Anna had failed to establish a *prima facie* case of dissipation with regard to the money that Raul had allegedly given to his parents for the purchase of the Homer Glen home. Raul asks, therefore, that we vacate the approximately $305,000 and $50,000 amounts that were awarded to Anna as dissipation.

¶ 70         Anna argues that the trial court's award of the two amounts was proper and should be upheld. First, as to Raul's draws from the businesses, Anna asserts that the trial court correctly determined, based upon the evidence presented, that the breakdown of the marriage had begun in January 2018 and that the amount that Raul had improperly drawn from the businesses was approximately $305,000. Anna maintains that Raul's assertions to the contrary were contradicted by the evidence presented and that Raul failed to meet his burden to show that the money was used for marital purposes. Second, with regard to the $50,000 that Raul claims was "backdoor" dissipation, Anna asserts that the award did not constitute reversible error and points out that

26

Raul does not dispute that he gave his parents $110,000 for the purchase of the Homer Glen home. In addition, Anna notes that contrary to Raul's assertion and the trial court's finding, she did allege that amount in her dissipation notice as part of the total amount that was given to Raul's parents for the Homer Glen home. Therefore, Anna asks that we affirm the trial court's finding of dissipation regarding the two amounts.

¶ 71     In a dissolution of marriage proceeding, if a claim for dissipation has been properly raised and presented, the trial court must consider that claim in dividing the marital property. See 750 ILCS 5/503(d)(2) (West 2020); *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶ 71. Dissipation occurs when one spouse uses a marital asset for his or her sole benefit and for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown. *In re Marriage of Tietz*, 238 Ill. App. 3d 965, 983 (1992). If the claiming party makes a *prima facie* showing that dissipation has occurred, the burden shifts to the party charged with dissipation to prove by clear and specific evidence how the funds were used. See *Brown*, 2015 IL App (5th) 140062, ¶ 66. If the funds were spent for legitimate family expenses and necessary and appropriate purposes, no dissipation will be found. *Tietz*, 238 Ill. App. 3d at 983. General and vague statements that the funds were spent on marital expenses or used to pay bills, however, are insufficient to avoid a finding of dissipation. *Id.* at 984. In addition, if the expenditures are not adequately documented by the party charged with dissipation, a trial court's finding of dissipation will be upheld. *Id.*

¶ 72     The decision of whether dissipation has occurred is a fact intensive inquiry that depends upon the unique facts of each individual case and often calls upon the trial court to make a credibility determination as to the explanation given by the party charged with dissipation on how the marital funds were used. See *Brown*, 2015 IL App (5th) 140062, ¶ 59; *Tietz*, 238 Ill.

27

App. 3d at 983-84. A trial court's ruling on dissipation, therefore, will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Vancura*, 356 Ill. App. 3d 200, 204-05 (2005). As noted above, a finding is against the manifest weight of the evidence only if it is clearly apparent from the record that the trial court should have reached the opposite conclusion or if the finding itself is unreasonable, arbitrary, or not based upon the evidence presented. See *Best*, 223 Ill. 2d at 350.

¶ 73                                    1. The Irretrievable Breakdown Date

¶ 74        In the present case, conflicting evidence was presented at the bench trial as to when the irretrievable breakdown of the marriage had begun to occur. Anna estimated in her testimony that the irretrievable breakdown had begun in about January 2017 and described how the marriage continued to deteriorate after the point. Raul, on the other hand, estimated that the breakdown had begun in about March 2021, when he was served with the order of protection and removed from the home. The trial court went over the entire history of the marital problems and ultimately found that the irretrievable breakdown of the marriage had begun in about January 2018. Based upon the conflicting testimony and the evidence presented showing an escalating deterioration of the marriage over a period of several years, we conclude that the trial court's finding as to when the irretrievable breakdown began was not against the manifest weight of the evidence. See *Vancura*, 356 Ill. App. 3d at 204-05; *Best*, 223 Ill. 2d at 350. Although the trial court later stated in its ruling that the irretrievable breakdown of the marriage was in January 2019, we believe, after reviewing the record, that the statement was merely a misstatement by the trial court and that it does not detract from the trial court's ruling on this issue.

¶ 75                                    2. Raul's Draws From the Businesses

¶ 76        With regard to Raul's draws from the businesses, after reviewing the evidence presented at the bench trial, we conclude that the trial court correctly found that Raul had dissipated marital funds by taking the draws at issue. The evidence presented in the bench trial established without significant dispute that Raul had taken draws from the restaurant businesses in 2019, 2020, and 2021 after the irretrievable breakdown of the marriage had begun. The total of those draws was approximately $305,000. The fact that the draws were taken and the amount of the draws were established by both Raul's testimony and also by the testimony of Anna's expert witness. Although Raul tried to claim that the draws included the reclassification of a loan that had been given from one of the business entities to the other and was not money that Raul had actually received, Anna's expert witness disagreed with that assertion and testified that Raul's draws had nothing to do with the loan between the businesses. In addition, while Raul tried to establish that at least some of the money was used for household expenses, his testimony that he gave Anna cash from time to time for those expenses was insufficient to satisfy Raul's burden in that regard. See *Tietz*, 238 Ill. App. 3d at 983 (indicating that general and vague statements that the allegedly dissipated funds were spent on marital expenses or used to pay bills are insufficient to avoid a finding of dissipation). Thus, because the trial court's finding of dissipation as to the draws that Raul had taken from the businesses was well supported by the evidence, we affirm the trial court's finding of dissipation as to those funds.

¶ 77                                    3. The Extra $50,000 Awarded to Anna

¶ 78        As for the extra $50,000 that the trial court awarded Anna, however, we must conclude that the trial court erred when it made that award. Although we agree with Anna that the amount was listed in her notice of dissipation as part of the total sum that she alleged Raul had given to

29

his parents for the purchase of the Homer Glen home, we cannot ignore the trial court's finding that Anna had failed to establish a *prima facie* case as to that particular claim of dissipation. Because the trial court had so found, it was improper for the trial court to have awarded that money to Anna for funds that Raul had allegedly given to his parents. We, therefore, reverse the trial court's award of the extra $50,000 to Anna, vacate that portion of the trial court's ruling, and remand this issue for the trial court to modify its order accordingly.

¶ 79                                            D. Anna's Work Retirement Account

¶ 80          As his fourth and final point of contention on appeal, Raul argues that the trial court erred by not dividing Anna's work retirement account between the parties as part of the marital estate. Although Anna suggests that the trial court's ruling on the retirement account was a proper exercise of discretion or, at the very least, that it had no effect on the outcome of this case, we cannot agree. It is clear from the record before us that the trial court incorrectly believed that there was no money left in Anna's retirement account. Anna's own testimony established, however, that she still had approximately $30,000 left in the account. The trial court's ruling to the contrary was based upon its mistaken belief, rather than an exercise of discretion, and we cannot conclude that the $30,000 amount is an insignificant amount, as Anna seems to suggest. We, therefore, reverse the trial court's ruling on this issue and remand for the trial court to determine the amount or percentage of Anna's retirement account to be awarded to each party.

¶ 81                                                          III. CONCLUSION

¶ 82          For the foregoing reasons, we affirm the trial court's finding that the Orland Park home and the two restaurant businesses were marital property. We also affirm the trial court's determination that Raul had dissipated approximately $305,000 in marital funds by taking draws from the restaurant businesses. We reverse the trial court's requirement that Raul pay retroactive

temporary maintenance and child support from his postdivision assets, the trial court's ruling that awarded Anna an additional $50,000 as implicit dissipation for money that Raul had given to his parents, and the trial court's determination that Anna had no money left in her work retirement account. We vacate those portions of the trial court's dissolution judgment and remand for the trial court to modify its order accordingly and to divide Anna's work retirement account between the parties.

¶ 83    Affirmed in part, reversed in part, and vacated in part.

¶ 84    Cause remanded.